**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

                          **Case No. 1:19-cr-25**

       **v.**                    **JUDGE DOUGLAS R. COLE**

**LELON CAMPBELL,**

       **Defendant.**

**<u>OPINION AND ORDER</u>**

This cause comes before the Court on Defendant Lelon Campbell's Motion to Suppress (Doc. 32). In that motion, Campbell argues that the search warrant affidavit failed to establish probable cause to search his friend's residence and his mother's residence. For the reasons discussed below, the Court **DENIES** the motion.

**FACTUAL BACKGROUND**

**A.    Officers Attempt Three Controlled Buys From Campbell.**

This criminal case centers on allegations that Campbell distributed controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C). On June 4, 2018, the Cincinnati Police Department began investigating Campbell after another police department reported that Campbell was dealing heroin in the Cincinnati area. (Casch Aff., Doc. 53-1, #367; Tr., Doc. 50, #311[1]). The next day, on June 5, 2018, officers arranged for a confidential informant ("CI-1") to purchase heroin from Campbell. (Casch Aff., Doc. 53-1, #368; Tr., Doc. 50, #318–19). CI-1 was well-known to

---

[1] Refers to PageID#.

Cincinnati officers, as he/she had "conducted controlled purchases of narcotics and provided information to law enforcement in the past which was proven true and accurate through independent investigation." (Casch Aff., Doc. 53-1, #368). Campbell and CI-1 met at a predetermined location, at which time officers allege that Campbell "refused to sell" heroin to CI-1 because Campbell saw cops in the area. Campbell allegedly said that he would sell heroin to CI-1 at another time. (*Id.*; Tr., Doc. 50, #319).

Campbell and CI-1 met again on June 8, 2021, and, this time, Campbell sold a substance to CI-1. (Casch Aff., Doc. 53-1, #368; Tr., Doc. 50, #322–23; Compl., Doc. 1). Officers recovered the substance from CI-1 and sent it to a lab for analysis. (Compl., Doc. 1, #4). The substance tested positive, not for heroin, but rather for fentanyl and cocaine. (*Id.*). Based on this information, officers obtained a warrant from a Hamilton County Judge to conduct real-time GPS ("PING") tracking of Campbell's phone. On July 3, 2018, officers used the PING data to track Campbell to a house on Meadowind Court. (Casch Aff., Doc. 53-1, #369; Tr., Doc. 50, #328). Officers watched as Campbell exited the Meadowind address with a satchel and used a key to lock the door behind him. (Casch Aff., Doc. 53-1, #369). On July 21, 2018, officers again observed Campbell coming and going from the Meadowind location, this time driving a Chevrolet Traverse. (*Id.*).

That same day, officers instructed CI-1 to conduct another controlled drug buy from Campbell. (*Id.*; Tr., Doc. 50, #341). CI-1 called Campbell, who instructed him/her to meet at a predetermined location. (Casch Aff., Doc. 53-1, #369; Tr., Doc. 50, #341).

When CI-1 arrived at the scene, however, Campbell did not exit his vehicle, which happened to be the same Chevrolet Traverse officers observed earlier. Instead, Campbell instructed CI-1 to follow him to a new, unspecified, location. (Casch Aff., Doc. 53-1, #369; Tr., Doc. 50, #341–42). Campbell then began to drive away, but before CI-1 could follow suit, police called-off the operation for safety reasons. (Casch Aff., Doc. 53-1, #369; Tr., Doc. 50, #341–42).

## B. Officers Surveil Campbell, Then Obtain And Execute A Search Warrant.

That failed operation represented the end of the officers' attempts at organizing a controlled buy. From that point forward, officers instead focused on surveilling Campbell.

The officers' first significant observation occurred on September 15, 2018, when police again observed Campbell exiting the Meadowind address. (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #313). Things were slow for a while, until, on October 2, 2018, officers in another department received an anonymous complaint that someone was dealing drugs from an address on East 69th Street. (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #327–28). Cincinnati officers responded to that address and observed Campbell conduct what appeared to be several hand-to-hand drug transactions, entering and exiting the residence several times between transactions. (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #328). The next day, on October 3, 2018, officers returned to that same address and again observed Campbell conduct what appeared to be hand-to-hand drug transactions, again entering and exiting the residence between sales. (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #328). Officers continued to

3

surveil Campbell for the next few days, and during that time, also observed him exiting the home on Meadowind. (Casch Aff., Doc. 53-1, #370).

In addition to the surveillance, officers continued to work with confidential informants, who provided information about Campbell's whereabouts and activities. Officers met with one of these confidential informants ("CI-2") on October 8, 2018. (Casch Aff., Doc. 53-1, #370–71; Tr., Doc. 50, #328–29). As was the case with CI-1, CI-2 was a source who had provided officers reliable information in the past. (Casch Aff., Doc. 53-1, #370–71). CI-2 provided officers several pieces of information, including dates and times when Campbell allegedly sold drugs from the East 69th Street location. (Tr., Doc. 50, #329). Officers then attempted to verify this information using PING tracking data. That location data matched CI-2's account of when and where Campbell was selling drugs. (Casch Aff., Doc. 53-1, #371). CI-2 also told officers that Campbell used a satchel to sell narcotics. (Tr., Doc. 50, #329). The description of the satchel matched the satchel officers observed on Campbell's person when he came and went from Meadowind. (*Id.*).

On October 11, 2018, another confidential source ("CI-3") contacted officers and told them that Campbell was selling drugs at East 69th Street. (*Id.*). Acting on CI-3's report, officers responded to East 69th Street address both on October 11, 2018, and October 15, 2018, and, again, observed Campbell conducting what appeared to be several hand-to-hand drug transactions on the porch of that residence. (Casch Aff., Doc. 53-1, #372; Tr., Doc. 50, #330–31).

4

Officer Casch, a Cincinnati police officer involved in the investigation, swore out an affidavit containing these facts. Based on that affidavit, the Hamilton County Municipal Court granted officers a warrant to search both the Meadowind address and the East 69th Street address. Although officers did not know it at the time, the Meadowind residence belongs to Campbell's mother and the East 69th Street house belongs to one of Campbell's friends. Officers recovered evidence of drug-trafficking at both locations.

## LAW AND ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. U.S Const. amend. IV. It is a "basic principle of Fourth Amendment law," "that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Conversely, a search conducted pursuant to a warrant is generally reasonable within the meaning of the Fourth Amendment. *Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco & Firearms*, 452 F.3d 433, 438 (6th Cir. 2006). Thus, the legality of a criminal investigation can turn on whether officers had a valid warrant authorizing the search.

Here, it is undisputed that the officers had a warrant. But Campbell argues that the warrant is invalid for two reasons, both of which impugn the supporting affidavit. First, Campbell alleges that the search warrant affidavit on its face did not provide probable cause for the Magistrate Judge to issue the warrant. (Tr., Doc. 50, #254). Second, Campbell claims that the warrant is invalid because the affiant

5

intentionally included false and misleading representations in the supporting affidavit. (*Id.*). The Court will address the issues in that order.

## A. Campbell Challenges Whether, On Its Face, The Affidavit Establishes Probable Cause To Search Both Residences At Issue.

Probable cause to search a residence exists if there is "a 'fair probability,' given the totality of the circumstances that contraband or evidence of a crime will be found in a particular place." *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) (quoting *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991))). Campbell argues that the affidavit, even if truthful, fails to establish "a fair probability" that contraband would exist at either the Meadowind or the East 69th Street address. He argues this is true for two reasons. First, Campbell asserts that the affidavit is deficient because Officer Casch, the affiant, relied on statements from confidential informants without corroborating that information. Second, Campbell argues that the affidavit fails to establish a sufficient nexus between any criminal activity and both residences. Neither argument undermines the magistrate judge's finding of probable cause.

### 1. Law Enforcement Properly Corroborated Each Confidential Source.

Campbell first argues that Officer Casch's affidavit does not establish probable cause because Casch did not corroborate the information officers received from several confidential informants. While there is no hard and fast rule requiring officers to corroborate information, corroboration is often important because it indicates that the information in the affidavit is reliable, which, in turn, affects the magistrate

judge's determination as to whether there is probable cause to issue a search warrant. The Sixth Circuit has explained, for example, that a magistrate judge could not reasonably find probable cause when the supporting affidavit relied only on an uncorroborated tip from an anonymous source. *United States v. Leake*, 998 F.2d 1359, 1365 (6th Cir. 1993).

In some cases, however, corroboration is not necessary. "[I]f a confidential informant—personally known by the affiant to be reliable—alleged direct, personal observation of criminal activity, then the affiant would not have to include in the affidavit further corroboration of the informant's allegations." *Brown*, 732 F.3d at 574 (citing *United States v. Allen,* 211 F.3d 970, 976 (6th Cir. 2000) (en banc)). An informant is "reliable" for this purpose if the "confidential informant has given accurate information in the past." *Id.* (quoting *Greene,* 250 F.3d at 480). In this instance, the affiant's testimony that the confidential informant is reliable provides a level of assurance to the magistrate judge, such that the court no longer needs corroboration to create probable cause.

Here, the affidavit supporting the warrant includes reference to four confidential informants. It is not entirely clear from Campbell's motion which one or more of the four informants give rise to his lack-of-corroboration concerns. But ultimately that does not matter, as the affidavit meets the above standards for reliability as to each of the four informants.

### i. The Confidential Informant Who Participated In The Controlled Buys.

The first confidential informant mentioned in the affidavit is CI-1, whose role in the investigation was to conduct (or to attempt to conduct) several controlled buys. To start, officers did not need to corroborate CI-1's account, because the affidavit specifies that CI-1 had conducted controlled narcotics buys for police before and had provided information that officers determined was true through an independent investigation. (Casch Aff., Doc. 53-1, #368); *see Brown*, 732 F.3d at 574 ("Moreover, our precedent 'clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable.'") (quoting *Greene*, 250 F.3d at 480).

Even though officers did not need to corroborate CI-1's account, the affidavit that the law enforcement officers tendered does so anyways. In fact, the affidavit avers that law enforcement personally witnessed CI-1 make calls to Campbell to arrange the controlled buys, and then closely monitored CI-1's conduct both before, during, and after each controlled buy. (*See, e.g.*, Casch Aff., Doc. 53-1, #368 ("CI#1, under constant supervision and control by officers, was monitored by members of Law Enforcement as he/she went to the predetermined meeting location."); Tr., Doc. 50, #319 (Officer Casch testified that "[w]e observed—myself and other officers— observed Mr. Campbell meet with the CI.")). These personal observations corroborate CI-1's report of the controlled buys.

### ii. The Anonymous Source.

The next informant mentioned in the affidavit is the anonymous source who told officers that Campbell was selling heroin from the East 69th Street location on October 2, 2018. (Casch Aff., Doc. 53-1, #370). The affidavit reflects that Cincinnati officers corroborated that information several times. First, officers immediately "responded to the area to conduct covert surveillance and observed Campbell conducting several hand-to-hand drug transactions." (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #327–28). Then, the next day, on October 3, 2018, officers returned to that same address and again observed Campbell conduct hand-to-hand drug transactions, entering and exiting the residence between sales. (Casch Aff., Doc. 53-1, #370; Tr., Doc. 50, #328).

### iii. The Confidential Informant Who Called Officers On October 8, 2018.

The third confidential source mentioned in the affidavit is CI-2, who called officers about Campbell on October 8, 2018. To start, the affidavit again specifies that CI-2, like CI-1, "has provided information to law enforcement in the past that was determined to be true through independent investigations." (Casch Aff., Doc. 53-1, #370–71). Accordingly, officers did not need to corroborate CI-2's information. *Brown*, 732 F.3d at 574.

As was the case with CI-1, however, the affidavit reflects that officers corroborated CI-2's information anyways. Recall that CI-2 gave officers several pieces of information, including dates and times when Campbell allegedly sold narcotics from the East 69th Street location. (Tr., Doc. 50, #329). The affidavit relates that

officers verified this information using PING tracking data, and found that it matched the CI-2's account of when and where Campbell was selling narcotics. (Casch Aff., Doc. 53-1, #371).

### iv. The Confidential Informant That Called Officers On October 11, 2018.

The final confidential informant mentioned in the complaint is CI-3, who called officers on October 11, 2018, and reported that Campbell was selling drugs from the East 69th Street address. (Casch Aff., Doc. 53-1, #371; Tr., Doc. 50, #330–31). Again, there is no corroboration problem with this source, as the affidavit relates that officers immediately responded to that address and again witnessed Campbell engage in several hand-to-hand drug transactions. (Casch Aff., Doc. 53-1, #372).

At bottom, a review of the record reveals that officers corroborated each confidential source mentioned in the affidavit. Thus, there is no corroboration problem, as Campbell alleges, that undermines the magistrate judge's finding of probable cause.

### 2. The Affidavit Established A Nexus Between The Illegal Activity And Both Residences.[2]

Campbell next argues that the affidavit "failed to establish [a] minimally sufficient nexus between illegal activity and [both the Meadowind and East 69th

---

[2] In order to suppress evidence from either address, Campbell would need to show that he has standing to challenge the search at that address. The government concedes that Campbell has standing to challenge the search at the East 69th Street address, where he was an overnight guest. (Tr., Doc. 50, #276–77 ("the way that [Campbell] establishes standing for the 69th Street address is legitimate in the body of case law relevant to this point that he's an overnight guest. That's at least the genre of what's appropriate.")).

Street locations].” (Mot. to Suppress, Doc. 32, #112). That argument starts on sound legal footing. In the Sixth Circuit, a search warrant for a residence requires “some reliable evidence connecting the known drug dealer’s ongoing criminal activity to the residence” to be searched—typically referred to as a nexus requirement. *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016). There are two residences at issue here: Campbell’s friend’s home on East 69th Street, and Campbell’s mother’s home on Meadowind. The Court addresses the search of each residence in turn.

---

The government, however, claims that Campbell does not have standing to challenge the search at Meadowind. (Tr., Doc. 50, #277–78). As Fourth Amendment standing is “not a jurisdictional question,” the Court does not need to decide the standing question here, especially because the Court later determines that Campbell’s argument fails on the merits. *United States v. Russell*, 361 F. Supp. 3d 753, 758 (S.D. Ohio 2019) (quoting *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018)).

Even so, the Court notes that the government’s main argument is that Campbell lacked standing at Meadowind because he did not live there and he was not an overnight guest at the time of the search. But a reasonable expectation of privacy is not limited to homeowners and overnight guests. Socials guests, too, can hold a reasonable expectation of privacy in their host’s home if they can show a “meaningful connection” to the residence. *United States v. Haynes*, 108 F. App’x 372, 375 (6th Cir. 2004).

The Sixth Circuit has held that a meaningful connection existed when the defendant “had been friends with the lessee for seven years, occasionally spent the night at the residence, kept some personal belongings there, and was permitted to be in the home while the owner was out.” *Id.* (summarizing *United States v. Pollard,* 215 F.3d 643, 647-48 (6th Cir. 2000)). Similarly, a meaningful connection existed when the defendant’s “host was his cousin, he slept on the couch as often as once a week for two years, he possessed a key to the residence, and he was able to exclude others.” *Id.* (summarizing *United States v. Heath,* 259 F.3d 522, 533 (6th Cir. 2001)).

Here, Campbell provided myriad facts indicating a similar degree of meaningful connection to Meadowind. As outlined below, Meadowind was Campbell’s mother’s home. He used the residence at all times of the day and night. He visited frequently, possessed a key, showered there, napped there, and maintained a room at the residence. Thus, Campbell likely shared his mother’s reasonable expectation of privacy at the Meadowind property. As noted, though, given the Court’s resolution on the merits, the Court need not, and does not, reach a final determination on the standing issue regarding the Meadowind address.

####     i.     The East 69th Street Address.

Start with the East 69th Street Address. The affidavit details how officers observed Campbell apparently selling drugs outside the home, while entering and exiting the home between transactions. Specifically, the affidavit explains that officers observed Campbell making what appeared to be hand-to-hand drug transactions at East 69th Street on four, separate occasions: October 2, 2018, October 3, 2018, October 11, 2018, and October 15, 2018. (Casch Aff., Doc. 53-1, #370, 372).

Campbell argues that this is not enough to establish a nexus to the East 69th Street property because officers did not "stop these so called purchasers" to verify that they bought narcotics and there is not any photo or video corroboration of the officers' observations. (Mot. to Suppress, Doc. 32, #113). But these extra steps are not necessary if officers personally observed drug transactions at a residence. In fact, the Sixth Circuit, in almost identical circumstances, held that "[c]ommission of a drug transaction outside of a house and one participant's walking back into the house, as observed in this case, plainly demonstrated a sufficient nexus with the house." *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011). The affidavit, accordingly, establishes a sufficient nexus between Campbell's illegal activities and the East 69th Street address.

####     ii.     The Meadowind Address.

#####         a.     The Affidavit Established Probable Cause to Search Meadowind.

"To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place,'" as opposed to some other place. *United*

*States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc). In other words, there must "be a nexus between the place to be searched and the evidence sought". (*Id.*).

Campbell argues that officers failed to establish that nexus as it relates to the Meadowind address. Specifically, Campbell claims that officers could not reasonably believe that evidence of drug activity would be found at Meadowind because officers did not see a drug sale occur at the Meadowind property during their investigation. (Tr., Doc. 50, #316).

This argument reads the nexus requirement far too stringently. The nexus requirement does not require officers to have unimpeachable, direct knowledge that evidence of illegal activity is at the location to be searched. Rather, as is the case with all probable cause inquiries, officers need only present sufficient evidence to allow a court to arrive at the "practical, common-sense" conclusion that "there is a fair probability that contraband or evidence of a crime will be found [at the residence at issue]." *United States v. Washington*, 380 F.3d 236, 240 (6th Cir. 2004) (quoting *Carpenter,* 360 F.3d at 594).

On the face of the affidavit, one connection to Meadowind is clear: Campbell appeared to use the property as a residence. Meadowind is Campbell's mother's home, but officers did not know that during their investigation. (Tr., Doc. 50, #342). Instead, officers watched as Campbell repeatedly and extensively used the property as if it were his home. Officers observed Campbell coming and going from the Meadowind property on almost a daily basis. Often, when Campbell went to the house on Meadowind, he stayed for significant periods of time. Officer Casch explained at the

hearing on the motion to suppress that "[a]ccording to my surveillance and ping location data, [Campbell] would spend multiple nights [at Meadowind]. [Campbell] would spend the night [at Meadowind], start his operation maybe 9:00 a.m. or 10:00 a.m. when he would leave the residence. He would typically return by, if I recall correctly, maybe 10:00 at night." (Tr., Doc. 50, #314).

Campbell's mother's testimony was similar. She said that Campbell was "always welcome to come home" to Meadowind. (*Id.* at #292). While he did not "live" there, Campbell had a room at the home and a key to the property. (*Id.* at #291). Campbell had free rein to stay at the house whenever he wanted to, with his mother going as far as to confirm that there is "absolutely not" an occasion when Campbell was not allowed at the property. (*Id.* at #292).

The affidavit discusses Campbell's extensive use of the property and, further, specifically recounts four separate times when officers observed Campbell using the Meadowind property: on July 3, 2018, July 21, 2018, September 15, 2018, and October 15, 2018. (Casch Aff., Doc. 53-1, #369–70). On the occasions during which officers observed Campbell using the property, he used a key to the house and would park his car outside the property. (*Id.*). In short, even if Campbell did not officially live there, the facts set forth in the affidavit suffice to show that Campbell was functionally using the house as his own personal residence for warrant purposes.

But, even if the facts support a conclusion that the Meadowind property serves as Campbell's residence, it is a separate question whether that conclusion in turn supports a finding of sufficient nexus to search that location. As this Court noted in

a recent opinion in another matter, courts in this Circuit have struggled with the issue of whether probable cause exists to search a suspected drug-dealer's residence for controlled substances based merely on the fact that the defendant resides there. *See United States v. Reliford*, No. 1:18-cr-147, 2021 WL 1960460, at *2 (S.D. Ohio May 17, 2021). As this Court also noted in *Reliford*, though, the Sixth Circuit recently explored the source of this confusion in an opinion that provides helpful clarity to this area of law. *Id.* (citing *United States v. Reed*, 993 F.3d 441 (6th Cir. 2021)).

The underlying problem, as *Reed* explained, is that the nexus inquiry implicates two competing Fourth Amendment principles. *Reed*, 993 F.3d at 444. The first principle is that "probable cause to arrest a suspect for a crime does not necessarily create probable cause to search the suspect's home." *Id.* The second principle is that "the probable-cause test allows officers to make common-sense conclusions about where people hide things." *Id.*

The tension between the two has given rise to arguably competing lines of cases. Channeling the first principle, for example, the Sixth Circuit has rejected "the proposition that the defendant's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *Brown*, 828 F.3d at 383 (quoting *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005)). But, channeling the second principle, the Sixth Circuit also has observed that, "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Sumlin*, 956 F.3d 879, 886 (6th Cir. 2020) (quoting *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)).

15

Given the tension between such statements, the Sixth Circuit has "reconciled [its] caselaw in fact-specific ways." *Reed*, 993 F.3d at 448. It has done so by holding that "a court need not rely on a known drug dealer's status *alone* whenever other evidence (besides the drug dealer's living there) links drug dealing to the dealer's home." *Id.* So, for example, the Sixth Circuit has found a probable-cause nexus to search a drug dealer's home when drugs were found in the drug dealer's car near the home. *See United States v. Berry*, 565 F.3d 332, 339 (6th Cir. 2009). The Sixth Circuit also has found this nexus when a suspect caught with drugs lied about his home address. *See United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996).

Thus, the question here is whether there is "other evidence" (besides Campbell's status as an alleged drug dealer, and the fact that he functionally lived at Meadowind) that links Campbell's drug dealing to the residence. There is such evidence here.

To start, the affidavit details an instance when, on July 21, 2018, officers observed Campbell exit the residence at Meadowind in a Chevrolet Traverse, and then "later," and "under surveillance by [Officer Casch]" arrived at a previously arranged controlled purchase of heroin in that same vehicle. (*Id.* at #369). This at least suggests a possibility that Campbell brought with him from the residence the drugs he was proposing to sell at the predetermined location.[3]

---

[3] This fact alone would resolve the nexus question if (1) the affidavit alleged that Campbell drove directly from the residence to the controlled buy, and (2) the affidavit alleged that Campbell sold drugs at the controlled buy. *See United States v. Coleman*, 923 F.3d 450, 457–58 (6th Cir. 2019); *United States v. Houser*, 752 F. App'x 223, 226–27 (6th Cir. 2018); *United States v. Jenkins*, 743 F. App'x 636, 644 (6th Cir. 2018). Here, however, the affidavit does neither. It does not allege that Campbell drove directly from Meadowind to the controlled

16

The Chevrolet Traverse was not the only car linking Campbell's drug activities to the Meadowind address. The affidavit reports that "brother officers" passed along to Officer Casch their intelligence that "Campbell is utilizing … a … Honda Accord … registered to … Meadowind Ct. … to facilitate the drug trafficking offense." (Casch Aff., Doc. 53-1, #367). On September 15, 2018, Officer Casch observed Campbell exiting Meadowind and entering into that same Honda Accord.

Finally, the affidavit claims that officers observed Campbell exit Meadowind carrying a satchel that a "reliable" confidential informant had previously identified as the bag Campbell uses to transport narcotics to and from sales. (Tr., Doc. 50, #329; Casch Aff., Doc. 53-1, #369). This fact also suggests that Campbell was using Meadowind to facilitate his drug trafficking operation.

Viewing the "totality of the circumstances," *Florida v. Harris*, 568 U.S. 237, 244 (2013), through the "lens of common sense," as the Supreme Court has instructed, *id.* at 248, these facts collectively give rise to probable cause to believe that a search of Meadowind would uncover evidence of drug trafficking.

### b. *Leon's* Good Faith Exception Applies.

Even if Casch's affidavit fails to provide probable cause for the warrant (and, to repeat, it doesn't), *United States v. Leon*'s exception to the exclusionary rule would

---

buy. Rather, it alleges only that Campbell left Meadowind in a Chevrolet Traverse and that "later" that same day officers observed Campbell arrive at a controlled buy in that same vehicle. Further, the affidavit does not say that Campbell actually sold drugs during this controlled buy. Instead, the affidavit explains that, when Campbell arrived at the controlled buy, Campbell instructed the confidential informant to follow him to another location to complete the transaction. These facts prevent the Court from finding a causal link purely on this ground. That said, the fact that Campbell left Meadowind and later arrived at a controlled buy in the same vehicle is still a factor relevant to the nexus inquiry.

doom Campbell's Motion to Suppress. 468 U.S. 897 (1984). That inexorably follows from the Sixth Circuit's recent decision in *Reed*, which also dealt with a nexus issue arising from law enforcement's search (pursuant to a search warrant) of a drug dealer's residence. In *Reed*, the government appealed a district court's decision to suppress evidence obtained from the search. The government did not challenge the district court's holding that there was an insufficient nexus between the alleged drug activity and the residence to support probable cause. Instead, the government argued that exclusion of the evidence was improper under *Leon's* exception. The Sixth Circuit agreed with the government for four reasons that the Court lists below in explaining why *Leon*'s exception also applies to Campbell's Motion.

Reason one: the affidavit establishes "two critical points." *Reed*, 993 F.3d at 451. The first point is that the "police had probable cause to believe that [Campbell] was a drug dealer who had engaged in recent drug sales." *Id*. Campbell sold drugs to a confidential informant on June 8, 2018. (Casch Aff., Doc. 53-1, #368). And Officer Casch submitted an affidavit detailing that controlled buy on October 17, 2018, just a few months after the controlled buy occurred. The second point is that the "police had probable cause to believe that [Campbell] lived at the residence." *Id*. Data obtained from a federal search warrant for Campbell's cell phone revealed that he had been spending his nights at the residence. Moreover, on several occasions while conducting surveillance of the residence, officers observed the same 2011 silver Chevrolet Traverse that Campbell used during the final attempted controlled buy

parked at the residence. (Casch Aff., Doc. 53-1, #369). These "points go a long way toward showing that *Leon*'s good-faith exception applies." *Reed*, 993 F.3d at 451.

Reason two: "[Officer Casch] could reasonably conclude that [Campell's] ongoing drug dealing sufficed to trigger [the Sixth Circuit's] 'well established' principle that if there is probable cause to suspect an individual of being an ongoing drug trafficker, there is a sufficient nexus between the evidence sought and that individual's home." *Reed*, 993 F.3d at 451 (quoting *United States v. Feagan*, 472 F. App'x 382, 390 (2012)). Not only had Officer Casch personally observed a completed controlled drug buy, but he had also received numerous tips from confidential informants about Campbell's alleged drug trafficking activities. For example, in October 2018, officers received information from both CI-2 and CI-3 that Campbell had allegedly sold drugs from an address on East 69th Street. (Casch Aff., Doc. 53-1, #372; Tr., Doc. 50, #330–31). Officers also personally witnessed Campbell engage in several hand-to-hand drug transactions in both September and October 2018. (Casch Aff., Doc. 53-1, #370, 372). Under *Reed*, this "recent reliable evidence of drug activity," goes a long way to trigger *Leon*'s exception. *Id.* (quoting *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018)).

Reason three: "[Officer Casch] did not rely on [Campbell's] drug activity alone. His affidavit described his experience investigating drug crimes," *id.*, noting that he "has been involved in numerous investigations and arrests for felony drug possession and drug trafficking." (Casch Aff., Doc. 53-1, #367). "And [Casch] indicated his belief that probable cause existed to search [Meadowind] was based, in part, on this

experience." *Reed*, 993 F.3d at 452. As *Reed* recognized, many "courts have highlighted an 'affiant officer's experience that drug dealers keep evidence of dealing at their residence' as an additional reason to find probable cause to search the drug dealer's home." *Id.* (quoting *Sumlin*, 956 F.3d at 886); *see also United States v. Goward*, 188 F. App'x 355, 358 (6th Cir. 2006); *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007). Thus, here, Casch's "experience at least provides another reason to trigger *Leon*'s exception." *Reed*, 993 F.3d at 452; *see also United States v. Acosta-Barrera*, 819 F. App'x 366, 372 (6th Cir. 2020); *United States v. Ardd*, 911 F.3d 348, 352 (6th Cir. 2018); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994).

Reason four: Courts cannot lose sight of the "the fact-intensive nature of the probable cause inquiry in known drug dealer cases." *Reed*, 993 F.3d at 452. (quoting *Brown*, 828 F.3d at 384). As a result, "officers will often find it difficult to know how the general standard … applies in the precise situation encountered." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Given the Sixth Circuit's own struggle to "reconcile [its] caselaw in these frothy nexus waters, how can [courts] expect nonlawyer officers to know better than judges that their affidavits do not suffice except in obvious cases?" *Reed*, 993 F.3d at 441 (quotations omitted). Thus, the "imprecise nature" of this inquiry supports the [Court's] conclusion that [Casch's] actions fall within the range of reasonableness permitted by *Leon*." *Id.* (quotation omitted).

As indicated above, these are the same four reasons that *Reed* pointed to in explaining why *Leon*'s exception applied in that case. As *Reed* is a published Sixth

Circuit decision with facts materially indistinguishable from those here, at least on those four key inquiries, *Reed* controls the Court's resolution of the issue here. Thus, even leaving aside the Court's conclusion that probable cause supported the warrant here, *Reed* defeats Campbell's Motion based on *Leon*'s exception.

## B. There Is Not Evidence That Officers Intentionally Lied Or Acted With Reckless Disregard For The Truth.

Finally, Campbell contends that the Court should set aside parts of the affidavit under *Franks v. Delaware*, 438 U.S. 154 (1978), because it contained "deliberate falsehoods" and statements made with "reckless disregard for the truth." (Campbell Post-Hearing Br., Doc. 55, #377). Campbell's arguments on this front fall into one of three categories, none of which pose a *Franks* problem.

First, Campbell alleges that several statements in the affidavit are "intentionally misleading" under *Franks* because Campbell disagrees with Officer's Casch's characterization of those events. For instance, Campbell argues that Officer Casch acted with reckless disregard for the truth when he stated that, on June 5, 2018, "Mr. Campbell met with the informant but refused to sell to CI#1." (Casch Aff., Doc. 53-1, #368). Campbell argues that this statement falsely characterizes an innocuous meeting as a failed drug sale. (Campbell Post-Hearing Br., Doc. 55, #382).

But Campbell does not submit any evidence, outside of his own self-serving affidavit, that would impeach Officer Casch's description of the attempted controlled buy. *See United States v. Shaffer*, 238 F. Supp. 3d 913, 921 (E.D. Ky. Mar. 3, 2017) ("[T]he Franks presumption of validity of an affidavit supporting a search warrant cannot be overcome by a self-serving statement which purports to refute the

affidavit.") (quoting *United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984)). To the contrary, there is information in the record that supports Officer Casch's story. For example, Officer Casch explained at the hearing on the motion to suppress that he "had personally witnessed CI number one speaking with Mr. Campbell on the phone as far as discussing prices and narcotics on the phone," and the affidavit reflected that fact. (Tr., Doc. 50, #322). The Officer further testified that he observed "Campbell direct[ ] … the CI to empty his pockets, and … inspect[ ] him for a wire." (*Id.*). Campbell did not attempt to show that Officer Casch was lying about these observations. Thus, the Court finds no support for Campbell's assertion that Officer Casch intentionally misled the Court about the nature of Campbell's meeting with CI-1.

Second, Campbell alleges that several statements in the affidavit are deliberate falsehoods under *Franks* because Campbell does not think that those facts were relevant to the drug investigation. For example, Campbell takes issue with the fact that the affidavit includes descriptions of times when Campbell visited the Meadowind address. (Campbell Post-Hearing Br., Doc. 55, #385). Campbell asks "[w]hat is important about October 5, 2018 as it relates to probable cause?" (*Id.*) Not much, according to Campbell, because, on that date, the affidavit states only that "officers … witnessed Campbell exit and leave the [Meadowind] location." (*Id.*). Campbell also argues that information about Campbell's arrests during the pendency of the investigation is irrelevant, and thus Officer Casch would have only included those statements if he intended to mislead the judge. (*Id.* at #387). Even if these facts

were irrelevant (which they are not), it does not matter for *Franks* purposes, because Campbell never argues that they are untrue. Thus, this argument, too, fails to illuminate a *Franks* issue.

Third, and finally, Campbell alleges that several statements in the affidavit are deliberate falsehoods under *Franks* because Campbell doubts those events happened. For example, Campbell alleges that Officer Casch never actually received a tip from CI-2. According to Campbell, "[i]t's interesting to note that some random CI just volunteered unsolicited information about Mr. Campbell and Ninth Street." (*Id.* at #385). Campbell also doubts that officers would have ended the third controlled buy in order to preserve the confidential informant's safety. "If in fact the officers have this CI under constant surveillance," Campbell reasons, "then why call of[f] the 'operation' when they could have apprehended Mr. Campbell in the middle of the unsafe act." (*Id.* at #383). Finally, Campbell theorizes that Campbell fabricated all of the information he received from fellow officers. In fact, Campbell does not think that these other officers existed at all. That is in part because he believes the affidavit should have identified the officers. (*Id.* at #388 ("Where are the 'brother officers' identifies?")). But, as is the case with many of Campbell's allegations above, Campbell does not provide any evidence that Officer Casch was lying, and Campbell's unsubstantiated suspicions do not suffice to show a *Franks* problem.

At bottom, while Campbell may doubt Officer Casch's rendition of the facts, Campbell has fallen short of his obligation under *Franks* to make a "substantial preliminary showing" that any statement in the affidavit was "false" or "knowingly

and intentionally [made] … with reckless disregard for the truth." *Franks,* 438 U.S. at 155.

**CONCLUSION**

For the reasons above, the Court **DENIES** Campbell's Motion to Suppress (Doc. 32).

**SO ORDERED.**

August 27, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**